[Cite as *Jenkins v. Giesecke & Debrient Am., Inc.*, 2012-Ohio-4136.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

RAYMONE JENKINS

    Appellant

    v.

GIESECKE & DEVRIENT AMERICA, INC.

    Appellee

C.A. No.     26205

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2011-02-0916

DECISION AND JOURNAL ENTRY

Dated: September 12, 2012

DICKINSON, Judge.

INTRODUCTION

{¶1} Raymone Jenkins, an African-American man, sued his employer, Giesecke & Devrient America Inc., alleging that it had allowed for his work environment to become and remain hostile because of his race. Giesecke & Devrient moved for summary judgment, arguing that most of the harassment Mr. Jenkins had endured was not because of his race, that the harassment was not severe or pervasive enough to create a hostile work environment, and that it had taken adequate corrective measures to remedy any harassment that may have been based on race. The trial court granted its motion. Mr. Jenkins has appealed, arguing that the court incorrectly granted summary judgment to Giesecke & Devrient. We affirm because Mr. Jenkins failed to establish that there is a genuine issue of material fact regarding whether he has been subjected to a hostile work environment because of his race.

BACKGROUND

**{¶2}** Mr. Jenkins has worked for Giesecke & Devrient since 1998. According to him, he began suffering workplace harassment in 2002 when Ryan Corsi asked him "how come black people always eat fried chicken and drink[ ] orange pop?" Mr. Jenkins reported Mr. Corsi's inquiry to their supervisor, Del Reyes, who reprimanded Mr. Corsi.

**{¶3}** In 2003, Mr. Jenkins discovered that someone had scratched "Raymone has crabs" on a desk. Although a company investigation into the incident was inconclusive, Mr. Jenkins believes that the person who wrote the words was Jeff Brown, a white co-worker.

**{¶4}** In June 2006, Mr. Jenkins's co-worker Caleb Carabello was entering the men's restroom when he saw a note posted over the sink that said "Raymone snorts cockroach shit." Mr. Carabello showed the note to Mr. Jenkins, who reported it to Donna Lappert, the company's human resources manager. The company's security manager, Nancy Langshaw, reviewed security videos, but was unable to determine who had posted the note because there were eight different employees who entered the restroom in the hour before Mr. Carabello discovered the note and each of the employees denied posting it. She suspected that Mr. Carabello, Mr. Brown, and Dave McKinney were responsible for the note, but did not have any evidence to support her theory. Following the incident, Giesecke & Devrient conducted a plant-wide meeting to remind its employees of its policy against workplace harassment.

**{¶5}** Later in 2006, Mr. Jenkins found a small yellow card at work that had "Raymone" written on one side and "punk" written on the other. Giesecke & Devrient investigated the incident, but was unable to determine who placed the card where Mr. Jenkins found it.

**{¶6}** Sometime following the incident with the yellow card, Mr. Jenkins found a pile of straw sitting on one of his car tires in the company parking lot. He suspected that one of his co-

workers placed the straw on his tire to harass him. Giesecke & Devrient began an investigation of the incident, but ended it after a robin was seen attempting to build a nest with straw on other employees' vehicles, including on their tires.

{¶7}　In September 2008, a co-worker told Mr. Jenkins that he had found a screen saver on a computer in which someone had modified the program to display the words "Raymone sux" over the normal picture. An investigation uncovered that the person responsible for the modification was Mr. Jenkins's friend Eric Buckley. According to Mr. Jenkins, the company initially did not take any action against Mr. Buckley. It was not until Mr. Jenkins filed a complaint with the Equal Employment Opportunity Commission that it fired him.

{¶8}　In November 2008, Mr. Jenkins reported to Giesecke & Devrient that someone had ripped the sleeve of his leather coat while it was in the company's locker room. Mr. Jenkins had placed the coat in the locker room while he was working. According to Giesecke & Devrient, security videos showed that Mr. Jenkins's coat was ripped before he arrived at work.

{¶9}　In 2009 and 2010, Mr. Jenkins had encounters with a coworker named Joe Jaronowski. According to Mr. Jenkins, Mr. Jaronowski harassed him by calling his name from different parts of the plant and engaging him in staring contests. Mr. Jaronowski also filed an allegedly false police report against him and teased him on a social networking website after someone at Giesecke & Devrient broke his cell phone while it was in a locker in the company locker room. Giesecke & Devrient admonished Mr. Jaronowski for his online comments, but did not take any other action because he had made the comments outside of work. It investigated who had smashed Mr. Jenkins's cell phone, but was unable to determine the perpetrator from security footage. Mr. Jenkins testified at his deposition that someone told Giesecke & Devrient that Mr. Carabello was the person responsible for breaking Mr. Jenkins's phone. The company

refused to act on the information, however, because it could not prove that Mr. Carabello had broken the phone.

{¶10} According to Mr. Jenkins, Mr. Jaronowski was not the only one who engaged him in staring contests. He testified that Mr. Corsi and Mr. Carabello also made him uncomfortable by having staring contests with him.

{¶11} In March 2010, Mr. Jenkins was going through the company's building security system, when the turnstile he had to pass through failed to let him in. When Mr. Jenkins asked Ms. Langshaw why the machine hadn't worked for him, Ms. Langshaw allegedly answered that it was "probably . . . because you're so dark." Mr. Jenkins interpreted Ms. Langshaw's statement as racist and reported it to Mr. Reyes. When Giesecke & Devrient investigated the incident, Ms. Langshaw said that she had told Mr. Jenkins that the machine only allows one person through at a time and that it may have mistakenly thought he was two people because of his size and the clothes he was wearing. She said that her "dark" statement referred to the color of Mr. Jenkins's shirt, not the color of his skin. Giesecke & Devrient issued her a written warning, however, because two witnesses to the conversation thought her comment was also a reference to the color of Mr. Jenkins's skin.

{¶12} Mr. Jenkins testified that the hostile work environment continued in 2011 when someone hung a couple of wall calendars in his work area. According to Mr. Jenkins, one of the calendars was from a law firm and the other was from a funeral home. Mr. Jenkins interpreted the hanging of a funeral-home calendar in his work area as someone "[t]ell[ing] me something like I'm going to wind up dead." When Mr. Jenkins complained to Mr. Reyes about the calendar, Mr. Reyes took it down.

{¶13} Mr. Jenkins also testified that he believed someone drove to his home and slashed the tires on his car so that he would be late the first day that Giesecke & Devrient began a no-tolerance attendance policy. He further testified that, after the attendance policy went into effect, he found a defaced copy of the policy in the locker room on which someone had written "bullshit mon." Mr. Jenkins interpreted the words on the attendance policy as a personal attack because "mon" is part of his first name. He disputed that the writing actually said "bullshit man." Mr. Jenkins did not know why someone would blame him for the attendance policy because he had nothing to do with it and had never complained to anyone about it. He reported the issue to Ms. Langshaw, but she told him that she was unable to investigate it because there were no security cameras in the locker room.

{¶14} In February 2011, Mr. Jenkins filed a complaint against Giesecke & Devrient, seeking to recover for having to endure a hostile work environment. Giesecke & Devrient moved for summary judgment, arguing that there was no evidence that most of the harassment Mr. Jenkins alleged he had endured was because of his race, that the harassment was not pervasive enough to constitute a hostile work environment, and that it had taken appropriate corrective action. Mr. Jenkins opposed the motion, but the trial court granted summary judgment to Giesecke & Devrient, concluding that most of the incidents of harassment were not because of Mr. Jenkins's race and that they were not so pervasive and severe that they created a hostile work environment.

HOSTILE WORK ENVIRONMENT

{¶15} Mr. Jenkins's assignment of error is that the trial court incorrectly granted summary judgment to Giesecke & Devrient on his hostile-work-environment claim. Under Section 4112.02(A) of the Ohio Revised Code, "[i]t shall be an unlawful discriminatory practice

. . . [f]or any employer, because of the race . . . of any person, . . . to discriminate against that person with respect to . . . terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." "In order to support a claim for hostile environment race harassment, a party must prove . . . '(1) that the harassment was unwelcome, (2) that the harassment was based on race, (3) that the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, [knew] or should have known of the harassment and failed to take immediate and appropriate corrective action.'" *Williams v. Spitzer Auto World Amherst Inc.*, 9th Dist. No. 07CA009098, 2008-Ohio-1467, ¶ 11 (quoting *White v. Bay Mech. & Elec. Corp.*, 9th Dist. No. 06CA008930, 2007-Ohio-1752, ¶ 8).

BASED ON RACE

{¶16} It is evident that the harassment Mr. Jenkins experienced was unwelcomed. The question is whether it was based on his race, which is the same as asking whether it was because of his race. *See Cooke v. SGS Tolls Co.*, 9th Dist. No. 19675, 2000 WL 487730 *2 (Apr. 26, 2000) (providing that the test for hostile work environment is whether the discrimination was "because of" plaintiff's membership in a protected class); *see also* R.C. 4112.02(A) (prohibiting discrimination "because of" membership in a protected class). The trial court determined that only two of the alleged incidents could be considered related to Mr. Jenkins's race: Mr. Corsi's question about the eating habits of "black people" and Ms. Langshaw's explanation that the security system did not allow Mr. Jenkins through because he was "dark."

{¶17} Mr. Jenkins has argued that all of the harassment he suffered was because of his race. *See Hampel v. Food Ingredients Specialties Inc.*, 89 Ohio St. 3d 169, 180 (2000) ("[W]e

hold that harassing conduct that is simply abusive, with no [racial] element, can support a claim for hostile-environment [racial] harassment if it is directed at the plaintiff because of his or her [race]." He has pointed to a statement in his affidavit in which he asserted that Mr. Reyes "told me he knew I had been through racism at work and that he was sorry." He has also asserted that Giesecke & Devrient fired Mr. Buckley for the "Raymone sux" message because it violated the company's anti-race harassment policy. Following that incident, it also sent a memorandum to all of its employees about its anti-racial-harassment policy. Furthermore, he has argued that, in response to the "Raymone snorts cockroach shit" message, the company conducted a plant-wide meeting to remind its employees about its anti-harassment policy.

{¶18} Mr. Reyes's alleged statement to Mr. Jenkins does not imply that he knew that all of the harassment Mr. Jenkins experienced was motivated by racism. Mr. Reyes was the person responsible for disciplining Mr. Corsi after he asked Mr. Jenkins the fried-chicken-and-orange-pop question so his statement may have only been a reference to that incident. To the extent that one might be able to infer that Mr. Reyes was referring to any or all of the other incidents, there is no evidence in the record that Mr. Reyes knew that the perpetrators of those acts of harassment did them because of Mr. Jenkins's race. The Ohio Supreme Court has held that, "[if] an affidavit containing opinions is made part of a motion for summary judgment, it is properly considered by a trial or reviewing court [if] it meets the requirements set forth in Civ.R. 56(E) and Evid.R. 701." *Tomlinson v. City of Cincinnati*, 4 Ohio St. 3d 66, paragraph one of the syllabus (1983). Under Rule 701 of the Ohio Rules of Evidence, "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "The

requirement that lay opinion testimony is rationally based on the witness' perception reflects a recognition of the limitation, embodied in Evid.R. 602, that a witness must have personal knowledge of matter to which he testifies." *Raymond v. Raymond*, 10th Dist. No. 11AP-363, 2011-Ohio-6173, ¶ 7. "Perception connotes sense:  visual, auditory, olfactory, etc." *Sec. Nat'l Bank & Trust Co. v. Reynolds*, 2d Dist. No. 2007 CA 66, 2008-Ohio-4145, ¶ 17. "The witness must have firsthand knowledge of the subject of the testimony and the opinion must be one a rational person would form based upon the observed facts." *In re Guardianship of Salaben*, 11th Dist. No. 2008-Ohio-6989, ¶ 67.

{¶19} Mr. Reyes's alleged belief that the people who harassed Mr. Jenkins were motivated by racism was a lay opinion. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 547 (7th Cir. 2011) (concluding that supervisor's testimony that a certain employee was a racist was a lay opinion). There is no evidence in the record, however, to establish that he had personal firsthand knowledge that the people who committed the "Raymone has crabs," "Raymone snorts cockroach shit," "punk," straw-on-tires, "Raymone sux," ripped-coat-sleeve, staring, false police report, broken-cell-phone, funeral-home-wall-calendar, slashed-tires, or "Bullshit mon" harassment events did so because of Mr. Jenkins's race. In addition, the circumstances of the incidents do not suggest that Mr. Jenkins was targeted by his co-workers because of his race. We, therefore, conclude that the trial court correctly determined that Mr. Reyes's alleged statement to Mr. Jenkins could not be considered in determining whether the harassment Mr. Jenkins suffered was because of his race. *See Tomlinson v. City of Cincinnati*, 4 Ohio St. 3d 66, paragraph one of the syllabus (1983).

{¶20} Regarding Mr. Jenkins's allegation that Giesecke & Devrient terminated Mr. Buckley because Mr. Buckley violated its anti-racial-harassment policy, the evidence in the

record does not support Mr. Jenkins's assertion. Mr. Jenkins testified at his deposition that he did not think that Mr. Buckley was racist. While the company's notes on why Mr. Buckley was fired indicate that it was "for harassment of a co-worker," they do not indicate that it was for racially-based harassment. Giesecke & Devrient submitted evidence that, in addition to having a company policy against harassment based on a protected characteristic such as race, sex, or age, it also has a "Code of Conduct" that provides that "[e]very employee has the right to be treated fairly, politely, and with respect by his . . . coworkers." Accordingly, it is not reasonable to infer that, because Mr. Buckley was terminated for harassing Mr. Jenkins, the harassment must have been based on a protected characteristic such as race.

{¶21} Regarding the memoranda that Giesecke & Devrient sent to its employees following the "Raymone sux" incident, the document actually only reminded employees about the company's prohibition of "making unwelcome and unsolicited sexual advances, or engaging in other verbal or physical conduct of a sexual or gender-biased nature . . . ." Moreover, just because the company sent out a memorandum or held meetings to remind employees about its anti-discrimination and harassment policy after some of the incidents of harassment does not support an inference that the harassment Mr. Jenkins experienced was because of his race. Upon review of the record, we conclude that Mr. Jenkins failed to demonstrate that there is a genuine issue of material fact regarding whether most of the incidents of harassment he experienced were because of his race.

## SEVERE OR PERVASIVE

{¶22} The trial court concluded that the harassment that Mr. Jenkins experienced that was based on his race was not severe or pervasive enough to support a hostile-work-environment claim. According to the Ohio Supreme Court, "the issue of 'whether an environment is hostile or

abusive can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hampel v. Food Ingredients Specialties Inc.*, 89 Ohio St. 3d 169, 180 (2000) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993)). In *Hampel*, it held that, "in order to determine whether the harassing conduct was 'severe or pervasive' enough to affect the conditions of the plaintiff's employment, the trier of fact, or the reviewing court, must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of [racism] or other abusive treatment [that was because of the race of the employee]." *Id*. at 181.

{¶23} The first racially-based incident, Mr. Corsi's question about fried chicken and orange pop, occurred in 2002. The other incident, Ms. Langshaw's "dark" statement, was in 2010. Neither incident was physically humiliating or threatening to Mr. Jenkins; they both involved "mere offensive utterances." *See Hampel v. Food Ingredients Specialties Inc.*, 89 Ohio St. 3d 169, 180 (2000). The events also appear to have been unrelated to each other. We conclude that, upon review of the totality of the circumstances, there is no genuine issue of material fact regarding whether the two racially-motivated harassment events, perpetrated by different co-workers eight years apart created a hostile work environment for Mr. Jenkins. They did not.

{¶24} Because the racially-based incidents were not severe or pervasive enough to create a hostile work environment, it is not necessary to review whether Giesecke & Devrient failed to take immediate and appropriate corrective action. We note, however, that it is not disputed that the company reprimanded Mr. Corsi for his question and that he did not repeat such

behavior. We also note that the company issued a written warning to Ms. Langshaw for her statement, even though there was uncertainty as to whether the statement was racist.

**{¶25}** The trial court correctly determined that Giesecke & Devrient was entitled to judgment as a matter of law on Mr. Jenkins's hostile-work-environment claim. Mr. Jenkins's assignment of error is overruled.

CONCLUSION

**{¶26}** The trial court correctly granted summary judgment to Giesecke & Devrient on Mr. Jenkins's hostile-work-environment claim. The judgment of the Summit County Common Pleas Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

                                                _____

                                                CLAIR E. DICKINSON
                                                FOR THE COURT

WHITMORE, P. J.
CONCURS.

CARR, J.
DISSENTING.

**{¶27}** I respectfully dissent.

**{¶28}** The majority excludes Mr. Reyes' statement on the basis that there was no evidence he had personal firsthand knowledge that the incidents of which Mr. Jenkins complains were motivated by race. I disagree. "Courts often have permitted lay witnesses to express opinions about the motivation or intent of a particular person if the witness has an adequate opportunity to observe the underlying circumstances." *Hansard v. Pepsi-Cola Metropolitan Bottling Co., Inc.*, 865 F.2d 1461, 1466 (5th Cir.1989). *See also Torres v. Cty. of Oakland*, 758 F.2d 247 (6th Cir.1985) (opining that the question whether national origin "motivated" a hiring decision was permissible).

**{¶29}** Mr. Reyes was Mr. Jenkins' supervisor for over nine years. As such, he was in a position to observe firsthand how Mr. Jenkins was treated by fellow employees over the years. Moreover, Mr. Reyes was charged with disciplining employees for inappropriate conduct. In fact, he disciplined Mr. Corsi for his "fried chicken" comment. Mr. Jenkins averred in his affidavit that Mr. Reyes acknowledged that Mr. Jenkins had been subjected to racism at work and recommended that he seek counseling. Even though Mr. Reyes disavowed these statements,

I would conclude that Mr. Jenkins presented evidence sufficient to meet his reciprocal burden of responding to a motion for summary judgment, by setting forth specific facts that demonstrate that a "genuine triable issue" exists to be litigated for trial. *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 449 (1996). Accordingly, I would reverse the trial court's judgment and remand the matter for trial.

APPEARANCES:

DAVID W. NEEL, Attorney at Law, for Appellant.

HANS A. NILGES and SHANNON M. DRAHER, Attorneys at Law, for Appellee.