[Cite as *Blagg v. S.T.O.F.F.E. Fed. Credit Union*, 2024-Ohio-2579.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

SHEILA A. BLAGG,                    :

    Plaintiff-Appellant,        :

                                    No. 112993

    v.                          :

S.T.O.F.F.E. FEDERAL CREDIT         :
UNION, ET AL.,

                            :

    Defendants-Appellees.

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 3, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-961513

---

### *Appearances:*

Employment Law Partners, LLC and Kami D. Brauer, *for appellant*.

Lewis Brisbois Bisgaard & Smith, LLP, Daniel A. Leister, and David A. Campbell, *for appellee* S.T.O.F.F.E. Federal Credit Union.

Baker & Hostetler LLP, Gregory V. Mersol, and Lauren T. Stuy, *for appellee* Nestlé U.S.A., Inc.

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Plaintiff-appellant, Sheila Blagg, appeals the trial court's order granting summary judgment in favor of defendants-appellees, S.T.O.F.F.E. Federal Credit Union ("S.T.O.F.F.E." or the "credit union") and Nestlé U.S.A., Inc. ("Nestlé") (collectively, "appellees"), on Blagg's claims of a racially hostile work environment in violation of R.C. 4112.02(A), retaliation in violation of R.C. 4112.02(I) and aiding and abetting retaliation in violation of R.C. 4112.02(J). Blagg, a white woman, alleges that her former employer, S.T.O.F.F.E., a credit union located in a Nestlé manufacturing facility, created and perpetuated a racially hostile work environment by subjecting her to "racial harassment," "racial jokes" and "threatening language" in the workplace and ignoring her complaints regarding black employees' discussion of race and race-related current events following the murder of George Floyd that made her "uncomfortable." Blagg further claims that S.T.O.F.F.E. unlawfully retaliated against her (1) by failing to bring her back to work after she voluntarily left the credit union and lodged a complaint with its board of directors and (2) by misapplying loan payments and reporting her accounts to a credit bureau after Blagg filed an employment discrimination charge with the Ohio Civil Rights Commission.

{¶ 2} Blagg claims that Nestlé unlawfully retaliated against her (1) by failing to investigate her complaint of a hostile work environment and (2) by "influencing" S.T.O.F.F.E.'s decision to cease its investigation and not bring Blagg back to work at the credit union. Blagg also claims that each appellee "aided and abetted" the other's

retaliation against her by failing to continue its own investigation of her complaints. Blagg contends that there are genuine issues of material fact as to appellees' liability on each of these claims and that the trial court, therefore, erred in granting summary judgment in their favor.

{¶ 3} For the reasons that follow, we affirm.

## I. Factual Background and Procedural History

### A. The Relationship Between Nestlé and S.T.O.F.F.E.

{¶ 4} S.T.O.F.F.E. is a credit union located within Nestlé's Solon manufacturing plant. It provides banking services to approximately 1,900 Nestlé employees and their families who have chosen to become members of the credit union. The credit union is governed by a board of directors comprised primarily of current and former Nestlé employees (the "board"). Nestlé and S.T.O.F.F.E. are separate, independent legal entities. Nestlé has no role in the hiring, compensation, evaluation, supervision, discipline or termination of credit union employees. Credit union employees receive no medical or other employee benefits from or through Nestlé; however, they are permitted to take advantage of certain "discounts" offered to Nestlé employees, including discounts on travel and a discounted Sam's Club membership.

{¶ 5} Because the credit union is located inside Nestlé's facility, for security reasons, during the time Blagg worked at the credit union, prospective credit union employees were required to pass a Nestlé "background check" before hiring, credit union employees (like other Nestlé contractors) received security badges issued by

Nestlé and credit union employees were required to use a "Nestlé computer" when accessing the internet. Nestlé also had input on the credit union's hours of operation and certain operational policies and procedures. As Blagg described the arrangement, the credit union had "office space in the Nestlé building but separate everything else" and "Nestlé, for all intents and purposes, is not responsible for the credit union."

## B. Blagg's Experience Working at the Credit Union

{¶ 6} In January 2018, the credit union hired Blagg as a "teller, supervisor." In June 2020, Blagg began to have issues with her coworkers' discussion of racial issues and racially related current events in the workplace. At that time, the credit union had four employees — Necia Burns, Felicia Ayers, Janet Daniels and Blagg. Burns, Ayers and Daniels (collectively, the "coworkers") are black. Burns, the credit union's manager and chief executive officer of the board, was Blagg's supervisor. Before the events giving rise to this action, Blagg and Burns had been "friends" for nearly 15 years.

## C. Alleged Racially Hostile Work Environment

{¶ 7} Blagg testified that, following the death of George Floyd,[1] her coworkers and Nestlé employees regularly discussed protests and "riots" related to

---

[1] George Floyd, a black American, was murdered by a white police officer in Minneapolis, Minnesota on May 25, 2020 during an arrest made after a store clerk suspected Floyd may have used a counterfeit twenty-dollar bill. Derek Chauvin, one of several police officers who arrived on the scene, knelt on Floyd's neck and back while Floyd pleaded that he could not breathe, causing his death. After Floyd's murder, there

the murder and other incidents of brutality or the disparate treatment of blacks by law enforcement that were then being reported in the media. Blagg claims that, beginning in June 2020, she was subjected to "a constant barrage of racially charged comments" in the workplace, including "racial jokes," discussions about race and the playing of videos of protests related to racially motivated incidents that made her "uncomfortable" and created a racially hostile work environment.

{¶ 8} When asked to describe exactly what happened in June 2020 that she believed gave rise to a racially hostile work environment, Blagg testified that "[p]retty much the entire month of June every single day [sic] was discussing something that happened in the media that day. An African American being shot. It was always some story of something every day. . . . There was constant race talk sometimes relating to the Rick[e]y Smiley show."[2] Blagg stated that while Nestlé employees were conducting business at the credit union, they would discuss "a black on a white" story with Burns or tell jokes with "white people being the butt of those jokes" and that "every day" black Nestlé employees who were friends of Burns and Daniels would go into the "back room" of the credit union, play videos of the "riots" on their cell phones and discuss them with Burns and Daniels. Blagg testified that no one showed these videos to her.

---

were numerous protests against police brutality, especially towards blacks, which received significant national and international media coverage.

[2] *The Rickey Smiley Morning Show* is a nationally syndicated radio program.

**{¶ 9}** When asked to identify the "specific events" that Blagg believed constituted "either [racial] discrimination or harassment" to which she was subjected at the credit union, Blagg testified that she and Ayers were once discussing an episode of the television show *Strange Addictions*, in which one woman ate cat fur and another ate diapers, when a credit union customer came in and said, "I'll bet you the woman eating the cat fur was a white woman, wasn't it?" Blagg asked the customer why he was "making it about race." When the customer continued to press Blagg for an answer, Blagg responded that the woman who ate cat fur was white but that the woman who ate diapers was black. When Blagg asked the customer, "What's the point?" The customer replied, "Because all white people do something jacked up. You guys are all doing something." Blagg stated that the conversation somehow then turned into a discussion between Burns and the customer about how most serial killers are white men.

**{¶ 10}** Blagg described another incident in which a credit union customer began telling a joke about a "white guy [who] walked into the bar" while he was conducting a transaction with Ayers. Blagg testified that because she was "the only white person in the credit union," she "tuned it out" and did not hear the rest. She stated that Ayers laughed at the joke. After the customer left the credit union, Blagg confronted Ayers, told Ayers the joke was not funny and asked her, "If I were to tell an African American joke, would that be funny?" Ayers agreed it would not be funny, apologized to Blagg and said she would never do it again. Blagg indicated that Ayers kept her word.

{¶ 11} With respect to the videos Nestlé employees showed to, and discussed with, Burns and Daniels in the back room of the credit union, Blagg testified that the videos were "not all" videos produced by "news media" but included "Facebook videos that people that they knew were posting" and included videos in which rioters "screamed, 'Kill white people.'"  She testified:

> Q    . . . Tell me the next event.
>
> A    Where Cornell[3] came in with his video and they were sitting in the back and they were listening to I believe it was Jesse Jackson. He was preaching about how it was now time to turn around and that the white man was going to suffer like they had been suffering for years.
>
> And that led into [Daniels] asking Cornell if he saw the riot where the white woman had gotten beat to crap.  And he was like, "No, I hadn't seen that."  And she said, "Yeah.  She was protecting her business."  She said, "She was doing a really good job of it at first. They turned around to leave, but she must have said something slick, so they all turned around and beat her up."  And [Burns'] response was, "Well, that's sad, but that's what happens when you anger people.
>
> Q    . . . Tell me the next event.
>
> A    Janet was reading an article on her phone and it said two reporters, I don't remember what country they were in, that had gotten into a little bit of trouble. It was a white reporter and a black reporter and you could only guess who they arrested.  Of course they arrested the black man because the white man never does anything wrong. . . .
>
> Q    Okay.  Anything else?
>
> A    There's a lot of them.  Just talks about sitting in the back of the bus and that how black people had always been made to sit in back of buses and that now we were going to know how that felt.

---

3 Otto Kadas, Nestlé's manager of human resources, testified that Cornell was an employee of Securitas, a Nestlé contractor.

It was like banter like that. Once it got into the banter, I would walk away from it.

Q       Anything else?

A       Not that I can think of offhand. It was just every day. To say how much I tuned out, I couldn't even tell you.

{¶ 12} Blagg also identified two other allegedly discriminatory incidents involving Burns. She testified that when Burns and Daniels "were having a race talk yet again," Burns walked over to Blagg, sat down beside her, asked Blagg how she would feel if her multiracial grandchild was called the "N word" and stated that she "wanted to see what [Blagg] is going to do the first time somebody calls her granddaughter . . . the N word." Blagg testified that another time, while she was eating a sandwich, Burns told her, "Sheila, black people don't eat that bread. That's white people bread." Although Blagg stated that she personally regarded these comments as "racial slurs," she acknowledged that no one had ever threatened her, called her any demeaning names or used any racial epithets towards her.

### D. S.T.O.F.F.E.'s and Nestlé's Policies against Harassment

{¶ 13} S.T.O.F.F.E.'s policy against harassment, set forth in its employee handbook, stated:

HARASSMENT POLICY

S.T.O.F.F.E. gives all employees the right to a work environment free from intimidation and harassment because of their sex, race, age, religion, disability and ethnic origin. Infractions of this policy should be reported to your immediate supervisor. In case the infraction is made by your own supervisor, report the violation to your supervisor's manager or some other supervisor. Employees should follow the same procedures in the Sexual Harassment Policy when reporting incident(s) of harassment.

S.T.O.F.F.E.'s sexual harassment policy stated, in relevant part:

> Any employee who has a complaint of sexual harassment or any other type of harassment by anyone at work, including supervisors, co-workers, vendors, customers or other visitors, must bring the problem to the attention of responsible S.T.O.F.F.E. officials. Employees who have a complaint of sexual harassment should direct their complaint either to the Office Manager or to the Board of Directors. If you feel uncomfortable in addressing your complaint to one of these people or if you believe that the person to whom you have directed your complaint has failed to properly investigate or remedy your complaint, you should feel free to take the matter up by contacting any member of the Board of Directors. Take immediate steps to stop the harassment. Do not wait until the situation gets worse.
>
> We will do all we can to make sure the workplace is free of discrimination or harassment, but we cannot take appropriate action if we do not know that discrimination or harassment has occurred.

{¶ 14} The S.T.O.F.F.E. employee handbook also included a "problem resolution policy," which stated:

> Problems may arise from time to time at S.T.O.F.F.E. It is our desire to do our very best to resolve such problems and, therefore, we have developed an internal problem solving procedure.
>
> 1.    If you have a problem or complaint, discuss it with your Office Manager immediately. It is an important part of his/her job to deal thoroughly and promptly in resolving problems. Due to his/her closeness to the situation, he/she should be best equipped to help resolve the problem. Most problems and complaints can and should be resolved at this level.
>
> 2.    If, after the first step, you still feel the matter has not been resolved, you may discuss it with any member of the Board of Directors of S.T.O.F.F.E. The member will thoroughly review your problem and discuss it with the appropriate parties concerned and the Board will make a final decision.
>
> This policy has been established for the expressed purpose of resolving problems. It will be administered so that you will not be penalized or otherwise suffer in any way for using this procedure for legitimate reasons.

It is our sincere belief that the prompt and effective use of the problem solving procedure will help to maintain harmonious relations among all employees at S.T.O.F.F.E.

{¶ 15} Nestlé's "Policy Against Harassment and Discrimination" stated that it applied to "all Nestlé applicants, employees, contractors, visitors, suppliers, vendors, and customers." It prohibited "[h]arassment by customers or vendors toward employees, or by employees toward other employees, customers or vendors." It defined "harassment" as

any unwelcome or unwanted conduct relating to an[y] race, creed, color, religion, sex (including pregnancy, childbirth or related medical conditions), national origin, immigration status, ancestry, age, marital status, protected veteran status, physical or mental disability or perceived disability, medical condition, genetic information, sexual orientation, gender identity, or any other protected status, as defined by applicable law, and if such conduct has the purpose or effect of:

• creating an intimidating, hostile, or offensive work environment;

• unreasonably interfering with an individual's work performance; or

• otherwise adversely affecting an individual's employment opportunities.

. . .

Harassment may include:

• verbal harassment, such as racial or sexual epithets; derogatory comments, demeaning jokes, slurs, threats, graphic verbal commentaries about any gender, race, religion, etc.; sexually or racially degrading words used to describe an individual; unwelcome flirtations, advances or propositions or other verbal abuse;

• physical harassment, such as assault, unnecessary or unwelcome touching, impeding or blocking movement, physical interference; or

• visual harassment, such as sexually, racially, or ethnically derogatory posters, cards, cartoons, graffiti, gestures, graphics, or other display in

the workplace. This prohibition extends to any kind of communication that is or may be seen by another, whether or not sent directly to them, and includes e-mail communications and inappropriate access to Internet site.

{¶ 16} With respect to the reporting and investigation of complaints of discrimination or harassment, Nestlé's policy provided:

Any employee, contractor, vendor or customer who believes he or she has been the subject of discrimination, harassment or retaliation must promptly report the incident. Employees should make their report to a supervisor, manager or Human Resources.

The Company will conduct a prompt, thorough, and objective investigation of any report of discrimination, harassment, or retaliation upon receipt of such report. Every effort will be made to conduct the investigation in the most discreet and confidential manner as possible. All employees are required to cooperate fully with any internal investigations, as requested. The Company will make a determination after completing its investigation and will take prompt and effective remedial action, which will be communicated to the complainant, and, as appropriate, any other directly concerned individuals.

. . .

Human Resources will ensure that a prompt and unbiased investigation is conducted and that proper corrective action is taken, as may be warranted.

The Company will not retaliate, nor will it allow any employee to retaliate against any employee for reporting conduct that the employee, in good faith, believes to be a violation of this Policy, or for participating in an investigation of alleged harassment or in any proceeding relating to alleged harassment.

### E. Blagg Complains to Burns

{¶ 17} Blagg testified that she took steps to address the situation on June 15, 2020 by informing Burns that she was uncomfortable with the discussion of race-related issues in the office. Blagg stated that when she arrived at the credit union

that morning, Burns had asked her if she had heard about "the black man who had been shot in a McDonalds by a white police officer when he was just standing there doing nothing." Blagg replied that she had not heard about the incident and told Burns that she "need[ed] a break" from race-related discussions. She stated, "Every day you guys are talking about race. . . . I need a break. I am uncomfortable. . . . I am the only white person in here and I am very uncomfortable." Blagg testified that Burns responded, "Good." According to Blagg, "She was happy I was uncomfortable. She wanted me to be uncomfortable so that I could understand how she felt."

{¶ 18} Blagg testified that, a few minutes later, after Daniels arrived, Burns announced, "Sheila, get ready to be uncomfortable again because I'm getting ready to talk about it." Burns then asked Daniels if she had listened to the Rickey Smiley show on her way to work and began talking "about the white cop who shot the black guy." Blagg walked away.

{¶ 19} Burns testified that she recalled Blagg being upset the morning of June 15, 2020 when she asked Daniels about something she had heard on the Rickey Smiley show. Burns acknowledged that Blagg had told her that she felt uncomfortable when Burns and others "were talking about George Floyd" and that Blagg had also told Burns that she "didn't want to talk about race for one day." Burns stated that she told Blagg, "Yes, Sheila, you should feel uncomfortable. Nobody felt comfortable with what was going on." Burns testified that the credit union was about to open, so she asked Blagg if they could discuss the issue at lunch. She

indicated that, weather permitting, she and Blagg usually walked around the Nestlé parking lot during their lunch break.

{¶ 20} Blagg testified that, at approximately 10:30 a.m. that morning, Burns raised an issue regarding a mask Blagg had purchased from a Nestlé employee that depicted an African-American girl. Blagg showed the mask to Daniels, who agreed the mask was "cute" and asked Blagg if she was going to wear it. According to Blagg, Burns stated that the employee who had made the mask "should be ashamed of herself making a black girl mask for [Blagg] to wear." Blagg testified that she, once again, told Burns that she was "extremely uncomfortable" and "needed a break" from race-related discussions and asked Burns if she could "just have one day" without discussions about race. Blagg stated that Burns replied: "I was going to talk to you about that at lunch. You can't ask us to not discuss race . . . [b]ecause it's very hurtful to us." Blagg testified that as she walked back to her work area, Burns and Daniels continued to discuss the fact that Blagg was asking them to not discuss race and that "[Blagg] needed to learn to suck it up and to deal with it."

### F. Blagg's Decision to Leave the Credit Union

{¶ 21} Blagg testified that, at lunch time, she began packing up some of her personal belongings, including her pay stubs, a fan and everything in her "junk drawer," but that she left other "important stuff" behind.[4] According to Blagg, Burns

---

[4] In her affidavit submitted with her opposition to summary judgment, Blagg testified that the items she left behind included makeup, hair clips, writing pens, markers, a sweater and a duffle bag.

observed Blagg packing up, but said nothing to her. At approximately 11:50 a.m., after making two trips to her car with her belongings, Blagg left the credit union. She never returned. Blagg testified that she had been listening to "constant race talk" for eight work days[5] before deciding to leave. Although Blagg testified at her deposition that she was still performing her job "in a satisfactory way," in an affidavit Blagg submitted with her opposition to summary judgment, she claimed that "[d]ealing with the daily racial harassment" caused her to be "continually stressed out and anxious at work," that she would take breaks or "run work errands" to "get out of the office" and that "[a] couple of times," she went out to her car and cried. Blagg claimed that the environment "made it more difficult" for her to perform her job duties because it was "hard to concentrate" and that she "started making mistakes" she had never made before, requiring her to correct her work.

{¶ 22} After she returned home, Blagg contacted Dawn Salata, the secretary of the credit union's board.[6] Blagg testified that she told Salata about "the events of the day" and that she had "walked out." According to Blagg, Salata said that she was "sorry" and that she "wasn't sure what to do at that point" but that she would call Blagg back later. Blagg stated that Salata told her "not to go back to work until they

---

[5] June 1, 2020 and June 15, 2020 were both Mondays. The credit union was open on Mondays, Tuesdays, Wednesdays and Fridays.

[6] At that time, Salata was also a Nestlé employee. Blagg testified that she communicated with Salata in her capacity as a board member, not as a Nestlé employee.

got this resolved," i.e., that "per policies and procedures,"[7] Blagg was "not to return until [Burns] reported the situation between [them] to the credit union."

{¶ 23} Salata testified that on June 15, 2020, she received a voicemail message from Blagg in which Blagg indicated that she had "walked out" of the credit union, that she "couldn't take it anymore" and "just left." Salata testified that when she returned Blagg's call later that day, Blagg told her she felt "uncomfortable" remaining at the credit union because her coworkers were "always talking about George Floyd" and "racial tensions and things that were going on in the media" and were "looking at videos" and that Blagg had asked her coworkers to "stop talking about it." Salata denied telling Blagg "not to report back to the credit union until this issue could be worked out." She testified that she told Blagg, "[I]f you feel uncomfortable, then don't go back. I mean, I want you to work it out. But I'm not telling her she has to report back to work. I never said, well, don't go back there." Salata stated that the following day, when in the office, she went into the credit union and exchanged pleasantries with Burns, but Burns did not say anything about Blagg.

{¶ 24} On June 16, 2020, Blagg emailed Burns regarding the prior day's events and "how I felt yesterday after I asked for the subject of race and all going on in this world not be talked about every single day because I was uncomfortable." She stated, "I do not imagine you and I will talk again. . . . I hate the way this ended. . . .

---

[7] The source of these alleged "policies and procedures" is not clear from the record. Neither S.T.O.F.F.E.'s harassment policy nor its problem resolution policy includes such a requirement.

I will send my badge and key back in a secured envelope." Burns called Blagg after receiving her email and left a message. After receiving Burns' message, Blagg texted Salata: "[Burns] doesn't feel that I've left the credit union. I've not responded or called back. I'm just so upset, hurt, and humiliated. She said she heard me. She understands and apologizes for that. She truly never meant to make me feel that way and wants to talk. She may not tell you that I quit." At her deposition, Blagg claimed that although she had "walked out" on June 15, 2020 and "quit for that day," she had not, in fact, terminated her employment with the credit union. She stated: "I was hoping to return to my position, once [Burns] reported my absence to the board." Blagg claimed that if Salata and the board had "followed policies and procedures,"[8] they would have had both Burns and Blagg appear before the board, discuss the issue, work it out and that Blagg would have come back to work "after it was discussed and worked out as it was supposed to have been." Blagg never returned her key or badge to the credit union.

### G. The June 17, 2020 Board Meeting and Blagg's Communications with Salata and Kadas

{¶ 25} Burns made no mention of Blagg's departure from the credit union at the next regularly scheduled board meeting held on June 17, 2020. On June 19, 2020, Salata set up a call with some of the other board members (not including Burns) to advise them that Blagg had left the credit union. Salata informed the other

---

[8] Once again, the source of these alleged "policies and procedures" is not clear from the record.

board members that Blagg had "walked out" because she felt "uncomfortable" "being the only white person" after other employees kept "talking about racial matters and things that are going on." The board did not address the issue right away. Salata testified that the board decided to "wait and see" if Blagg and Burns could "work it out" before taking further action. Following her call with the other board members, Salata texted Blagg: "We talked briefly, today and the board is concerned. We are going to reconvene next week and decide how to proceed." Salata then inquired whether Blagg had had any further communications with Burns. Blagg responded: "[Burns] reached out to [me] the one time that I told you about. I text[ed] her and told her that I would call her back. I'm not going to do that until I can talk about this w/o crying. I've reached out to a couple of attorneys, but haven't made up my mind as of yet." Salata indicated that the board was going to talk to Burns and address the issue the following week: "[I]t isn't right and we wouldn't be doing our job if we don't investigate and address what is appropriate and not appropriate to discuss at work. Bottom line is that if a member of the staff walks out, we need to know about it so we can do our due diligence." Blagg responded that she had just received another email from Burns asking Blagg to meet the following Monday after work "to see if there is something we can do to salvage it." Blagg did not respond to Burns' requests to meet or discuss the issue.

{¶ 26} On June 22, 2020, Salata informed Blagg that the board had decided to "discuss [the issue] with HR" and asked Blagg whether she had had any further communications with Burns. Blagg indicated that she had not heard further from

Burns and advised Salata that she had filed a complaint against the credit union with the Equal Employment Opportunity Commission ("EEOC"). Blagg texted Salata: "I lost a friend of 15 years and my job. It's a sucky place to be at 49." At her deposition, Blagg stated that, in her mind, "losing" her job (as she referred to the situation in her text) was not the same as "quitting." She testified: "When Dawn and I were speaking that entire time, me coming back was always with [Burns'] dismissal and [Daniels'] dismissal."

{¶ 27} On June 23, 2020, Salata contacted Otto Kadas, Nestlé's manager of human resources. She testified that she advised Kadas that one of the credit union's employees had walked out, claiming that her coworkers were talking about "inappropriate things" at work and that "racial tensions . . . were transpiring." She asked Kadas if he would be willing to talk to Blagg, "basically as a resource," and that Kadas said he would "see what he could do." Salata testified that this was the first time she had ever contacted Nestlé's human resources department.

{¶ 28} Kadas then called Blagg.[9] Blagg testified that she told Kadas "about the events on June 15 in the morning," i.e., her conversation with Burns before anyone came into the office and the subsequent conversation involving her, Burns and Daniels. She stated that Kadas asked her if she could come into the office to speak with him. According to Blagg, she told him she could not come into the office

---

[9] In his affidavit submitted in support of Nestlé's motion for summary judgment, Kadas testified that his conversations with Salata and Blagg occurred "on or about June 19, 2020." Other sources indicate that these conversations occurred on June 23, 2020.

"because the Board does not want [Burns] and I to speak face to face until it is in front of them and they had to wait for [Burns] to report it to them and she had not done that." Blagg testified that, at his request, Blagg sent Kadas copies of "all the emails" she had and that Kadas told Blagg he was going to "investigate" and would get back to her after he completed his investigation. Salata texted Blagg on June 25, 2020 and told her that she had spoken with Kadas and that he was "investigating" and would "follow up . . . as needed." Blagg stated that she attempted to follow up with Kadas a couple of times but that, other than to confirm receipt of the emails she had sent him, he never replied.

{¶ 29} Kadas testified that, after speaking with Blagg and confirming that the conduct of which she was complaining involved only credit union employees,[10] he spoke with Nestlé's counsel, Ebony Douglas. After speaking with Douglas, Kadas informed Salata that there was no further action for him to take related to Blagg's complaint because Blagg's complaint did not involve any Nestlé employees. He suggested that Salata contact the credit union's legal counsel. Kadas testified that he took no further action on the matter.

{¶ 30} When asked at her deposition, "What is it that you claim that Nestlé did wrong to you?" Blagg responded:

---

[10] As stated above, although Nestlé employees/credit union customers were allegedly involved in making racial jokes and playing videos while they were in the credit union, Blagg has not claimed any harassment or discrimination by Nestlé employees. Blagg testified that she informed Kadas about "the events on June 15 in the morning," which involved only her interactions with Burns and Daniels.

A    When Nestlé became aware of the situation, I was told that they were going to investigate it and that Otto would get back to me with the findings of his investigation.  At that point Nestlé did speak with Dawn Salata and another Board member prior to speaking with me.  And then it's my understanding that he was supposed to do an investigation and then according to Otto he would call me back.  I spoke with him.  I sent him the documents.  That was the last I heard from Otto.  They did no investigation. They just dropped it at that point.

Q    Is there anything else that you believe that Nestlé did wrong other than Otto not getting back to you on the investigation?

A    To me that's a big one.

Q    I'm not saying it is or is not.  I'm simply asking is there anything else?

A    Not that I'm aware of, no.

{¶ 31} Salata also spoke with Nestlé's counsel, Douglas.  Salata testified that when she called Douglas, she did not realize that the credit union had its own legal counsel.  After confirming that the credit union was a separate legal entity with its own legal counsel, Douglas recommended that Salata reach out to the credit union's counsel for guidance on how to proceed and Salata did so.

**H.  Blagg's Application for Unemployment Benefits and Related Communications with Salata**

{¶ 32} In or around late June or early July 2020, Blagg filed an application for unemployment benefits with the Ohio Department of Job and Family Services.[11] Her claim for benefits was disallowed on the ground that she had quit her employment without just cause.  Blagg appealed the denial of benefits.  In July 2020,

---

[11] It is unclear from the record when Blagg filed her application for unemployment benefits.   Her application for unemployment benefits is not part of the record on appeal.

Blagg began texting Salata regarding issues surrounding her application for unemployment benefits. Blagg testified that in mid-August, Salata informed Blagg that she could no longer communicate with Blagg because it had become "a legal matter." In October 2020, the Ohio Unemployment Compensation Review Commission affirmed the denial of unemployment benefits.

## I. The July 15, 2020 Board Meeting and Aftermath

{¶ 33} At the July 15, 2020 board meeting, Burns advised the board that Blagg had "walked off the job" and that the credit union was looking for a new teller. Burns testified that she told the board that Blagg became "upset" and had "walked out" and that she had reached out to Blagg to see if they could talk about what led Blagg to walk out, but that Blagg never responded to her. Burns claimed that she did not know what made Blagg so upset that she would leave and not come back to the credit union. Burns testified that she forwarded copies of the emails Blagg had sent Burns after Blagg left the credit union to the board.

{¶ 34} Salata testified that Burns reported that Blagg had been upset and uncomfortable as a result some "back and forth" regarding Black Lives Matter and the George Floyd incident, that Blagg had walked out of the credit union and that Burns had reached out to Blagg after Blagg left the credit union, hopeful that they could work it out. The July 15, 2020 board meeting minutes state: "Sheila Blagg has resigned from the credit union. Actively pursuing her replacement."

{¶ 35} Salata testified that Blagg had forwarded copies of the emails exchanged between Blagg and Burns after Blagg left the credit union to Salata and

that she, in turn, shared them with other members of the board. Salata indicated that Blagg was never asked to appear before the board to discuss her complaint of a hostile work environment, that Burns was never asked to appear before the board to address Blagg's complaint of a hostile work environment and that no one else (including Ayers or Daniels) was interviewed by the board regarding Blagg's complaint. Salata stated that Burns was not disciplined for her delay in reporting to the board that Blagg had left the credit union.

{¶ 36} With respect to how her employment at the credit union ended, Blagg testified, "They didn't bring me back." Blagg stated that she "did not start looking for employment until September or October of 2020" because she "assumed" she would be "going back to the credit union," i.e., "the conversations between Dawn Salata and myself were always that I would be going back." Blagg indicated that, based on her communications with Salata, it was her understanding that once Burns reported to the board that Blagg had left, the board would hold a meeting with Burns, Blagg and the entire board to address the issue. She explained:

> [Salata] informed me that I was not to return until [Burns] reported the situation between [Burns] and myself to the credit union, per policies and procedures. . . . I wanted to go back to my job. I did not want to go back to the situation the way that it was. So if [Salata] and the Board would have followed policies and procedures, they would have had [Burns] and I both come in. We would have discussed it. We would have worked it out and I would have come back to work after it was already discussed and worked out as it was supposed to have been.

Q    Okay. So you were willing to return to work?

A    After [Burns] and I discussed it with the Board, yes.

{¶ 37} According to Blagg, after Burns reported the situation to the board in July 2020, the board "just went with [Burns'] version without investigating it at all" and "effectively terminat[ed]" Blagg. After Blagg left the credit union, her position remained open for a significant period of time. Vernita Hill, a black woman, was hired as Blagg's replacement in November 2021.

## J. Blagg Files Charges with the Ohio Civil Rights Commission

{¶ 38} In, or around, August 2020, Blagg filed an initial employment charge of discrimination against S.T.O.F.F.E. with the Ohio Civil Rights Commission ("OCRC"), alleging that she had been subject to "forced resignation" and/or "lay off/denial of recall" due to workplace racial discrimination. In May 2021, the OCRC dismissed Blagg's initial charge against S.T.O.F.F.E., finding that it was "not probable" that S.T.O.F.F.E. had engaged in an unlawful discriminatory practice in violation of R.C. Chapter 4112 and the OCRC issued notice of a right to sue.

{¶ 39} In December 2021, Blagg filed a second employment charge of discrimination against S.T.O.F.F.E. with the OCRC, alleging that S.T.O.F.F.E. had unlawfully retaliated against her by "discharge/termination," misapplying loan payments and making negative reports to a credit bureau. She also alleged that S.T.O.F.F.E. had unlawfully "aid[ed] and abet[ed] discrimination/retaliation" in violation of R.C. 4112.02(J). Blagg also filed an initial employment charge of discrimination against Nestlé, alleging that Nestlé had unlawfully retaliated against her by "discharge/termination" and had "aid[ed] and abet[ed]

discrimination/retaliation" in violation of R.C. 4112.02(J). In March 2022, Blagg withdrew these charges and received notices of the right to sue.

### K. Blagg Files Suit in the Cuyahoga County Common Pleas Court

{¶ 40} On April 22, 2022, Blagg filed a complaint in the Cuyahoga County Court of Common Pleas, asserting a hostile-work-environment claim in violation of R.C. 4112.02(A) against S.T.O.F.F.E. and claims of retaliation in violation of R.C. 4112.02(I) and aiding and abetting in violation of R.C. 4112.02(J) against both S.T.O.F.F.E. and Nestlé. In her complaint, Blagg alleged that two of her black coworkers had "engaged [Blagg] in multiple, adversarial conversations about race on a daily basis" and had "told multiple racist jokes about [Blagg] and other [w]hite individuals" in her presence and the presence of credit union customers. She claimed that her coworkers' conduct made her work environment "hostile and uncomfortable" and made it "difficult for her to perform her job duties." Blagg alleged that she had complained to her supervisor about the "harassment" but that, "instead of addressing her complaints," her supervisor "participated in and continued the harassment" and failed to promptly report Blagg's complaints to the board. Blagg alleged that the board had engaged Nestlé's human resources department to investigate Blagg's complaint, that S.T.O.F.F.E., "in collaboration with" Nestlé, "made the decision to terminate [Blagg] in retaliation for her

complaints"[12] and that after she filed a charge against S.T.O.F.F.E. with the OCRC, S.T.O.F.F.E. retaliated against her by misapplying Blagg's loan payments and filing negative reports with a credit bureau.

{¶ 41} Blagg claimed that, as a result of appellees' actions, she sustained economic and noneconomic damages, including pain and suffering, "negative financial consequences" and "a significant drop" in her credit score. Blagg requested an award of statutory damages, compensatory damages, back pay, front pay, "all benefits lost," punitive damages, pre- and postjudgment interest, attorney fees and costs. Appellees filed answers in which they denied any wrongful conduct and asserted various affirmative defenses.

## L. Motions for Summary Judgment

{¶ 42} In April 2023, S.T.O.F.F.E. and Nestlé filed separate motions for summary judgment. S.T.O.F.F.E. argued that it was entitled to summary judgment on Blagg's claims because it did not employ a sufficient number of employees to be subject to R.C. Chapter 4112. S.T.O.F.F.E. further argued that Blagg could not prevail on her retaliation claim against the credit union because she had voluntarily resigned and that Blagg could not prevail on her hostile-work-environment claim because she had failed to show S.T.O.F.F.E. was the "unusual employer who discriminates against the majority" and "eight days of George Floyd discussion" was

---

[12] Blagg did not allege in her complaint that any Nestlé employees had harassed her or had otherwise created, contributed to or perpetuated a racially hostile work environment.

not "severe or pervasive" racial harassment. S.T.O.F.F.E. maintained that Blagg's aiding and abetting claim was aimed at Nestlé because Nestlé employees were not alleged to have harassed or retaliated against Blagg and S.T.O.F.F.E. could not "aid and abet a non-party in discriminating against its employee."[13]

{¶ 43} Nestlé argued that it was entitled to summary judgment on Blagg's retaliation and aiding and abetting claims because there was no genuine issue of material fact that (1) Blagg was a credit union employee — not a Nestlé employee, (2) Nestlé had no control over the terms and conditions of Blagg's employment with the credit union and took no adverse action against her, (3) Blagg had voluntarily quit her job at the credit union, (4) Blagg could not show a causal relationship between her complaint about race-related harassment at the credit union and the termination of her employment and (5) Blagg's aiding and abetting claim was derivative of her failed retaliation claim and, therefore, failed as well.[14]

---

[13] In support of its motion, the credit union submitted excerpts from Blagg's deposition and an affidavit from Burns in which Burns (1) provided information regarding the number of employees employed by the credit union, the history of her relationship with Blagg, her unsuccessful efforts "to try and get [Blagg] to return to work" and text messages Blagg had sent her in July 2020 showing Burns pictures of Blagg's grandchild and (2) authenticated copies of documents, including the Unemployment Compensation Review Commission's October 2020 decision and the initial charge of employment discrimination Blagg filed with the OCRC.

[14] In support of its motion, Nestlé submitted (1) Blagg's deposition transcript with exhibits, (2) Blagg's 2018-2020 W-2s, (3) an affidavit from Salata in which she described her role and job responsibilities at Nestlé, the composition and function of the board and her communications with Blagg and Kadas regarding Blagg's complaint, (4) an affidavit from Kadas in which he described his prior position at Nestlé, employment benefits Nestlé provided to its employees that were not provided to credit union employees and his communications with Blagg and Salata regarding Blagg's complaint and (5) copies of documents related to the employment charges of discrimination Blagg filed with the OCRC in December 2021.

{¶ 44} Blagg opposed the motions, arguing that the credit union had the requisite number of employees at the time of the alleged harassment to be subject to R.C. Chapter 4112, that a defendant need not be an "employer" to be liable under R.C. 4112.02(I) and (J) and that "overwhelming testimony and documents" demonstrated genuine issues of material fact that could "only be resolved by the finder of fact" as to each of her claims against appellees.[15]

{¶ 45} The trial court granted the motions, stating:

> The court, having considered all of the evidence and having construed the evidence in a light most favorable to the non-moving party, determines that there are no genuine issues of material fact and defendants are entitled to judgment as a matter of law. Summary judgment us hereby rendered in favor of defendants S.T.O.F.F.E. Federal Credit Union and Nestlé USA, Inc., and against Plaintiff Sheila A. Blagg, as to all claims.

The trial court did not otherwise explain the basis for its ruling.

{¶ 46} Blagg appealed, raising the following assignment of error for review:

> The trial court erred in granting Appellees' motions for summary judgment because: (a) considering the evidence submitted by Ms. Blagg in a light most favorable to her as required by Civ.R. 56(C), genuine issues of material fact remained for the jury to decide; and (b)

---

[15] In support of her opposition, Blagg submitted (1) her own affidavit in which she, among other things, described the personal items she left behind after she left the credit union, the effect of the alleged racial harassment on her work performance and alleged credit union procedures regarding the allocation of member's funds, (2) copies of the transcripts (and select exhibits) from the depositions of Salata, Burns and Kadas, (3) an affidavit from her counsel authenticating certain documents, (4) text messages and emails Blagg had exchanged with credit union employees and board members regarding her complaints, her unemployment appeal and S.T.O.F.F.E.'s allocation of her loan payments, (5) a blank S.T.O.F.F.E. employment application, (6) an email from a Nestlé employee referring to Blagg as a Nestlé "contractor," (7) Nestlé's Policy Against Harassment and Discrimination, (8) S.T.O.F.F.E.'s employee handbook, (9) select board agendas and meeting minutes, (10) Blagg's "credit report," (11) Blagg's December 2021 OCRC charges and related right-to-sue notices and (12) Nestlé's and S.T.O.F.F.E.'s discovery responses.

Appellees failed to meet their burden to demonstrate [the absence of] genuine issues of material fact as required under *Dresher v. Burt*, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996).

## II. Law and Analysis

### A. Standard of Review

{¶ 47} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). We accord no deference to the trial court's decision and conduct an independent review of the record to determine whether summary judgment is appropriate.

{¶ 48} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law. *Id.* On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292–293 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

{¶ 49} A fact is material if it "'might affect the outcome of the suit under the governing law' of the case." *Oko v. Cleveland Div. of Police*, 2021-Ohio-2931, ¶ 23 (8th Dist.), quoting *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993). "A factual dispute is 'genuine' only if 'it allows reasonable minds to return a verdict for the nonmoving party.'" *Huntington Natl. Bank v. Blount*, 2013-Ohio-3128, ¶ 32 (8th Dist.), quoting *Sysco Food Servs. v. Titan Devs.*, 1995 Ohio App. LEXIS 4762, *7 (9th Dist. Oct. 25, 1995).

### B. Blagg's Claims Against S.T.O.F.F.E. and Nestlé

#### 1. Hostile-Work-Environment Claim Against S.T.O.F.F.E.

{¶ 50} Pursuant to R.C. 4112.02(A), it is an "unlawful discriminatory practice . . . [f]or any employer, because of the race . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A)'s prohibition of racial discrimination includes "'hostile environment' harassment" i.e., "harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment." *Hampel v. Food Ingredients Specialties*, 89 Ohio St.3d 169, 176 (2000).

#### a. Application of R.C. 4112.02(A) to S.T.O.F.F.E.

{¶ 51} Before considering the merits of Blagg's hostile-work-environment claim, we must first determine whether S.T.O.F.F.E. is an "employer" within the meaning of R.C. Chapter 4211. During the time period at issue, R.C. 4112.01(A)(2)

defined "employer" to include "the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer."

{¶ 52} Citing Burns' affidavit submitted in support of its motion for summary judgment, S.T.O.F.F.E. contends that the trial court properly granted summary judgment in its favor on Blagg's hostile-work-environment claim because the credit union "only employs three employees."

{¶ 53} It is not, however, the number of employees a party employs at the time a motion for summary judgment (or a complaint) is filed that determines whether a party is an "employer" under R.C. 4112.01(A)(2). Rather, it is the number of employees a party employed at the time the alleged discrimination occurred. *See, e.g., Cisneros v. Birck*, 1995 Ohio App. LEXIS 1555, *14–15 (10th Dist. Apr. 11, 1995) ("In R.C. 4112.01(A)(2), the legislature determined that an employer was any person employing four or more people. The statute does not say that an employer is any person who employed four people during any period of time whatsoever. Reading the definition of 'employer' in R.C. 4112.01(A)(2), along with the prohibition contained in R.C. 4112.02(A), it is apparent that the legislature meant that the employer must have at least four employees at the time the discrimination occurred."); *see also Dudley v. Stonecroft Ministries, Inc.*, 142 F.Supp.3d 653, 659-660 (S.D.Ohio 2015) (plaintiff must present evidence that defendant employed four or more employees in Ohio at the time the alleged harassment or discrimination occurred for defendant to constitute an "employer" under R.C. 4112.01 and 4112.02);

*Sublett v. Edgewood Universal Cabling Sys.*, 194 F.Supp.2d 692, 698–699 (S.D.Ohio 2001) ("[A]n out-of-state corporation who has four employees working within the state at the time the alleged discrimination occurred is an 'employer' within the meaning of the Ohio Civil Rights Act."). Here, there is no dispute that S.T.O.F.F.E. employed four employees in Ohio at the time the alleged harassment occurred. Accordingly, S.T.O.F.F.E. is an "employer" for purposes of Blagg's hostile-work-environment claim under R.C. 4112.01(A)(2) and 4112.02(A).[16]

### b. Racially Hostile Work Environment

{¶ 54} A hostile work environment exists where a workplace "'is permeated with discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986) (internal quotation omitted).[17]

---

[16] Whereas R.C. 4112.02(A) prohibits discrimination by "any employer," R.C. 4112.02(I) and (J) proscribe unlawful discriminatory practices by "any person." There is no dispute that both S.T.O.F.F.E. and Nestlé constitute "persons" under R.C. Chapter 4112. *See* R.C. 4112.01(A)(1).

[17] Due to the similarities between R.C. 4112.02 and Title VII of the Civil Rights Act of 1964 ("Title VII"), Ohio courts often look to federal cases interpreting Title VII when considering employment discrimination claims brought under Ohio law. *See, e.g., Ingram v. Glavin*, 2023-Ohio-1290, ¶ 46 (8th Dist.); *see also Wholf v. Tremco Inc.*, 2015-Ohio-171, ¶ 24 (8th Dist.) (observing that because Ohio's antidiscrimination laws in R.C. Chapter 4112 are "modeled after Title VII," Ohio courts have found federal case law interpreting Title VII to be generally applicable to cases involving alleged violations of R.C. Chapter 4112); *Crable v. Nestlé USA, Inc.*, 2006-Ohio-2887, ¶ 23 (8th Dist.) ("R.C. Chapter 4112 is Ohio's counterpart to [Title VII]. Therefore, federal case law interpreting Title VII is generally applicable to cases brought under Chapter 4112.").

{¶ 55} To prevail on a hostile-work-environment claim based on racial harassment, a plaintiff must show that (1) he or she was subject to unwelcome harassment, (2) the harassment was based on race, (3) the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment" and (4) either (a) the harassment was committed by a supervisor or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.[18] *Hampel*, 89 Ohio St.3d at 176-177; *Hinton v. Ohio Dept. of Youth Servs.*, 2022-Ohio-4783, ¶ 33 (10th Dist.); *Jenkins v. Giesecke & Devrient Am., Inc.*, 2012-Ohio-4136, ¶ 15 (9th Dist.).

{¶ 56} The standard for assessing hostility is "demanding" in order to "filter out complaints that attack 'the ordinary tribulations of the workplace.'" *Faragher*

---

[18] S.T.O.F.F.E. asserts that because Blagg is white she must meet a "heightened standard" and must also demonstrate the existence of "'background circumstances'" showing that S.T.O.F.F.E. is "'the unusual employer who discriminates against the majority.'" (Appellee's Br. at 10-11), quoting *Arendale v. Memphis*, 519 F.3d 587, 604-605 (6th Cir. 2008). Blagg disputes this and argues that such a requirement applies only where a plaintiff seeks to prove his or her hostile work environment claim through indirect evidence, not where, as here, a plaintiff has direct evidence that she was subject to a racially hostile work environment. In the alternative, Blagg argues that she has alleged facts sufficient to show that S.T.O.F.F.E. was "the unusual employer" because (1) she was the only white employee, (2) her supervisor, Burns, who was also the CEO of the board, was black, (3) her supervisor "engaged in the discriminatory conduct with her Black co-workers and Black employees of Nestlé," was the "decision-maker regarding whether Ms. Blagg could return to work" and/or "influenced the Board's decision to cease investigating Ms. Blagg's complaints," (4) her supervisor sought to replace Blagg within 30 days of her complaint of a hostile work environment and (5) Blagg's replacement was black. We need not resolve that issue here because, as discussed below, Blagg cannot establish other essential elements of her hostile-work-environment claim.

*v. Boca Raton*, 524 U.S. 775, 788 (1998), quoting B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992); *see also Chapa v. Genpak, LLC*, 2014-Ohio-897, ¶ 35 (10th Dist.) (same); *Parker v. Hankook Tire Mfg. Tenn., LP*, 2023 U.S. App. LEXIS 34010, *10 (6th Cir. Dec. 21, 2023) ("'This standard sets a high bar for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect.'"), quoting *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 485 (6th Cir. 2020). Conduct that is "merely offensive" is insufficient to support a hostile-work-environment claim. *Harris* at 21. Likewise, actions such as "simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct." *E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010).

{¶ 57} In evaluating whether alleged harassment was sufficiently "severe or pervasive" to affect the terms, conditions or privileges of employment and create a hostile work environment, the work environment must be viewed "as a whole," considering the "totality" of the facts and circumstances, including the frequency of the alleged discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance. *Hampel* at 180-181; *Hinton* at ¶ 36. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether — taken together — the reported incidents make out such a case." *Williams v. GMC*, 187 F.3d 553, 562 (6th Cir. 1999); *Clay v. UPS*, 501 F.3d 695, 708 (6th Cir. 2007) (observing

that in a hostile work environment, the actionable wrong is the environment, not the individual acts that together create the environment).

{¶ 58} The "severe or pervasive" inquiry has both an objective and a subjective component: "'The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.'" *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021), quoting *Black*, 104 F.3d at 826; *see also Hampel*, 89 Ohio St.3d at 176 ("'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'"), quoting *Harris*, 510 U.S. at 21-22; *Rice v. Cuyahoga Cty. Dept. of Justice*, 2005-Ohio-5337, ¶ 32 (8th Dist.); *Chapa*, 2014-Ohio-897, at ¶ 55 (10th Dist.). A plaintiff can prevail by showing that the harassment was severe or pervasive or both. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (explaining that these terms are "properly considered in the disjunctive"). "'[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.'" *Hampel* at 181, quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991).

{¶ 59} Applying these legal standards to the facts of this case, it is clear that a reasonable person could not conclude, based on the evidence presented by Blagg,

that the conduct at issue was sufficiently severe or pervasive to constitute a racially hostile work environment.

{¶ 60} Blagg contends that S.T.O.F.F.E. created and perpetuated a racially hostile work environment by allowing its employees to engage in inappropriate, race-related discussions and language in the workplace.  Blagg contends that she presented sufficient evidence to survive summary judgment on her hostile-work-environment  claim based on (1) Blagg's deposition testimony describing the "daily harassment, racial conversations and jokes," the "constant barrage of racially charged comments" and the "threatening language hurled at her on a daily basis," (2) evidence that her supervisor, Burns, ignored Blagg's complaints and "encourag[ed] and contribut[ed] to discriminatory and threatening racial comments" and (3) Blagg's affidavit testimony explaining how the alleged harassment caused her stress and anxiety and negatively impacted her work performance.

{¶ 61} S.T.O.F.F.E. maintains that the trial court properly granted summary judgment in its favor on Blagg's hostile-work-environment claim because (1) the discussions at issue "were not based on [Blagg's] race," but rather, "on the events that were taking place in the country after the Floyd murder," (2) no reasonable factfinder could find the alleged harassing conduct to be "severe or pervasive" and (3) Blagg admitted during her deposition that the discussions did not impact her work performance.

{¶ 62} As an initial matter, we disagree with Blagg's characterization of her evidence.  The record does not support Blagg's conclusory assertions that she was subjected to a "constant barrage" of "racially charged comments," that Burns "encouraged" or "contributed to" "threatening racial comments" or that "blatant racially charged and threatening language" was "hurled at" Blagg on a daily basis. Vague, conclusory assertions, unsubstantiated by evidence of specific facts in the record, are insufficient to meet a party's burden on summary judgment.  *See, e.g., Jochum v. Listati*, 2019-Ohio-166, ¶ 21 (8th Dist.) (plaintiff's conclusory statements, unsupported by specific facts or corroborating evidence, did not create a genuine issue of fact for trial); Civ.R. 56(E) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."); *see also Arendale*, 519 F.3d at 605 (conclusory assertions, supported only by the plaintiff's own personal opinion that he was the victim of racial harassment "cannot withstand a motion for summary judgment"); *Wein v. N.Y. City Dept. of Edn.*, 2020 U.S. Dist. LEXIS 150136, *45 (S.D.N.Y. Aug. 19, 2020) (""[P]urely conclusory allegations of discrimination" that are devoid of "concrete particulars" do not suffice to avoid summary judgment"), quoting *Pucino v. Verizon Wireless Communications, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010), quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *Ilana Gamza-Machado de Souza v. Planned Parenthood Fedn. of Am., Inc.*, 2023 U.S. Dist. LEXIS 54305, *20

(S.D.N.Y. Mar. 29, 2023) (plaintiff's testimony about "continual" bullying by her supervisor without detail on when or how often the supervisor allegedly "bullied" her, what she said or how she said it, was "too vague and conclusory" for a jury to find that the "bullying" itself was "extraordinarily severe" or that, when taken together with other more specific instances of discriminatory conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment to support a Title VII hostile-work-environment claim).

{¶ 63} At her deposition, Blagg was asked to identify the specific instances of workplace conduct that she contended constituted harassment because of her race. She indicated that her racial harassment claim was predicated on (1) coworkers' references to, and her overhearing workplace discussions of, race-related current events and radio programs regarding those current events, (2) her overhearing videos of protests Nestlé employees played for, and discussed with, Burns and Daniels in the back room of the credit union, (3) a conversation with a credit union customer regarding an episode of the *Strange Addictions* television program and his observation that "all white people do something jacked up," (4) overhearing a conversation between Burns and that same credit union customer regarding the prevalence of white male serial killers, (5) overhearing a joke a credit union customer told another credit union employee about a "white guy walk[ing] into a bar," (6) a few offhand comments by Burns (i.e., an inquiry as to how Blagg would react if someone were to call her multiracial granddaughter the "N" word, a comment that Blagg was eating "white people bread" and Burns' views regarding a

mask Blagg had purchased depicting an African-American girl) and (7) Burns' disregard that the workplace discussions of race-related issues were making Blagg uncomfortable. According to Blagg, these instances of "racial harassment" occurred over eight work days.

{¶ 64} Although it has been said that the question of whether conduct is severe or pervasive is "'quintessentially a question of fact,'" *see, e.g., Retuerto v. Berea Moving Storage & Logistics*, 2015-Ohio-2404, ¶ 40 (8th Dist.), quoting *Stachura v. Toledo*, 2008-Ohio-3581, ¶ 33 (6th Dist.), courts have, nevertheless, affirmed grants of summary judgment, in appropriate cases, after determining that the alleged conduct was not sufficiently severe or pervasive to create a hostile work environment as a matter of law. *See, e.g., Hinton*, 2022-Ohio-4783, at ¶ 41 (10th Dist.) (summary judgment was appropriate on hostile-work-environment claim where appellants failed to demonstrate a genuine issue of fact that alleged racial harassment was so severe or pervasive as to create an objectively hostile work environment); *Chapa*, 2014-Ohio-897, at ¶ 65-66, 69 (10th Dist.) (trial court properly granted summary judgment in favor of employer on hostile-work-environment claim where reasonable minds could come but one conclusion on the issue). This is such a case.

{¶ 65} Even assuming Blagg subjectively perceived her workplace to be a racially hostile work environment, she has not shown the existence of a genuine issue of fact as to whether a reasonable person would find Blagg's work environment to be objectively racially hostile.

{¶ 66} The evidence Blagg presented does not paint a picture of a workplace "permeated with discriminatory intimidation, ridicule, and insult" because of race. Discussion of race-related current events is not harassment based on race. Although certain of the acts and comments Blagg found objectionable may have been insensitive or obnoxious, R.C. Chapter 4112, like Title VII, is not meant to be a general, workplace "civility code" and "'the sporadic use of abusive language, . . . jokes, and occasional teasing'" is not sufficient to establish liability on a hostile-work-environment claim. *Faragher,* 524 U.S. at 788, quoting *Sexual Harassment in Employment Law* at 175; *cf. Varner v. Video Indus. Servs.*, 2012 U.S. Dist. LEXIS 196855, *48 (N.D.Ala. Apr. 2, 2012) (alleged workplace harassment is not "automatically" discrimination because of race "merely because the words used are racial and/or offensive in nature"); *Bass v. E. I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) ("callous behavior" by plaintiff's superiors was insufficient to state a claim based on a hostile work environment). Further, "second-hand harassment," i.e., where comments are not directed at the listener, is generally regarded as less severe. *See, e.g., Chapa*, 2014-Ohio-897, at ¶ 45 (10th Dist.), citing *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (comments need not be directed at plaintiff to create a hostile work environment, but that fact contributed to the court's conclusion that the conduct at issue was not sufficiently severe to create an objectively hostile work environment).

{¶ 67} It is undisputed that no one ever physically or verbally threatened Blagg, that no one called her any demeaning, humiliating or derogatory names, that

no one used any racial epithets towards her and that no one showed her any racially offensive images. The race-related conversations Blagg found objectionable involved the discussion of current events (and the viewing of videos) by her coworkers and Nestlé employees regarding race relations, police interactions with black citizens and protests that were happening across the country in the aftermath of the murder of George Floyd. Blagg did not herself view the videos or participate in any discussions about them. The "threatening racial comments" of which Blagg complains were not directed toward her but were allegedly made by protesters during protests of violence against blacks, which Blagg heard when Nestlé employees played videos of the protests for Burns and Daniels in the back room of the credit union. The "racial jokes" about which Blagg complains — regarding which Blagg testified regarding only one incident during her deposition — were allegedly made by credit union customers transacting business at the credit union. There is no evidence in the record that any such jokes were told to Blagg or made about her.

{¶ 68} As Blagg testified during her deposition and as she repeatedly told Burns, Salata and others, she complained about her work environment and decided to leave the credit union, not because she felt threatened, degraded or humiliated because of her race but because, after eight days in the nearly two-and-one-half years she had worked at the credit union, she had grown tired of hearing about the subject, i.e., the "constant race talk," and because Burns and her other coworkers had failed to honor her request to give her "a break" and have "one day" in which "the topic of race" was not discussed. Blagg testified:

I asked her [Burns] if we could have one day where we weren't discussing race because I was extremely uncomfortable being the only white one in the office . . . and that I just needed a break. I wanted to not be uncomfortable.

. . .

I said, "Necia, I just, I need a break. I need a break." I said, "Every day you guys are talking about race, every day." I said, "I need a break. I am uncomfortable."

. . .

And I reiterated again to Ms. Burns that I just needed a break. That I was extremely uncomfortable. That I just need a break. "Can't you just give me today?"

Blagg further explained her view of the situation as follows:

Here is where I'm at with this. . . . In the credit union, because it was so small and there were only three other people, we all had subjects that we were not to talk about because it bothered one person or another. We all had them. [Daniels] didn't want to discuss a certain topic. [Ayers] didn't want to discuss a certain topic. [Burns] had certain topics. We all respected that. But when I had an issue because it was offensive to me, I was told I had to suck it up.

So by any law, by the policies and procedures in S.T.O.F.F.E.'s own handbook and the guidelines in Nestlé, if an employee is telling you they are uncomfortable due to a racial conversation, it needs to be stopped. She did not stop it. She not only did not stop it, they encouraged more of it.

{¶ 69} Blagg has not cited any cases involving similar facts in which a racially hostile-work-environment claim survived summary judgment, and we have found none. Following a thorough review of the record, construing the facts the light most favorable to Blagg and considering the totality of the circumstances, we conclude that the allegedly harassing conduct Blagg identified was not sufficiently severe or pervasive that a reasonable person could find Blagg's work environment

to be objectively racially hostile. Accordingly, the trial court did not err in granting summary judgment in favor of S.T.O.F.F.E. on Blagg's hostile-work-environment claim. *Cf. Childers v. GM LLC*, 2019 U.S. Dist. LEXIS 24100, *27-28 (E.D.Mich. Feb. 14, 2019) (although they may have been offensive to plaintiff, the playing of "inappropriate racially charged videos" and "racially-charged comments" like "these are your people," "black people are always late" or "black people do meth," most of which were not directed to plaintiff, did not constitute a severe or pervasive work environment sufficient to sustain a hostile work environment claim); *Brinson v. Summit Cty.*, 2023 U.S. Dist. LEXIS 106667, *28-31 (N.D.Ohio June 20, 2023) (no reasonable juror could find that plaintiff was subjected to a "hostile work environment of race discrimination" where plaintiff, director of diversity for a sheriff's office, was subjected to chief's "hurtful" comments "several times" related to the deaths of Breonna Taylor and/or George Floyd and "the intersection of race and policing" but no "racially charged comments" were made to plaintiff directly, no comments were made to plaintiff that were physically threatening or humiliating and plaintiff testified that although he felt "offended," he could "maintain [his] professionalism each time [they] spoke about these "hurtful issues").

### 2. Retaliation Claims Against S.T.O.F.F.E. and Nestlé

{¶ 70} R.C. 4112.02(I) states that it is "an unlawful discriminatory practice . . . [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any

manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

{¶ 71} Blagg claims that S.T.O.F.F.E. unlawfully retaliated against her (1) by failing to bring her back to work after she complained about her racially hostile work environment and left the credit union and (2) by misapplying loan payments and reporting Blagg's accounts to a credit bureau after she filed her initial charge against S.T.O.F.F.E. with the OCRC. Blagg claims that Nestlé unlawfully retaliated against her (1) by failing to investigate her complaint of a hostile work environment and (2) by "influencing the [c]redit [u]nion's decision to cease its investigation and to not bring [Blagg] back to work."

{¶ 72} Blagg does not present any direct evidence that the conduct she challenges was retaliatory; she relies on indirect evidence. Retaliation claims based on indirect evidence are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Greer-Burger v. Temesi*, 2007-Ohio-6442, ¶ 13-14; *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, ¶ 36 (10th Dist.).

{¶ 73} To establish a prima facie case of retaliation under R.C. 4112.02(I), a plaintiff must establish that (1) he or she engaged in a protected activity, (2) the defendant knew the plaintiff engaged in protected activity, (3) the defendant took an adverse employment action against the plaintiff and (4) a causal connection between the protected activity and the adverse action. *Greer-Burger* at ¶ 13; *Ingram,* 2023-Ohio-1290, at ¶ 47 (8th Dist.); *Ferguson v. Univ. Hosps. Health Sys.*,

2022-Ohio-3133, ¶ 118 (8th Dist.); *Moody* at ¶ 36. If the plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant to articulate a legitimate, nonretaliatory reason for its action. *Greer-Burger* at ¶ 14, citing *McDonnell Douglas*, 411 U.S. at 802; *Moody* at ¶ 36. If the defendant carries its burden, the burden shifts back to the plaintiff to establish that the defendant's proffered reason was not the true reason but a pretext for unlawful retaliation. *Greer-Burger* at ¶ 14, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Moody* at ¶ 36.

{¶ 74} Here, there is no dispute that Blagg engaged in protected activities when she complained about her allegedly hostile work environment and when she filed a charge with the OCRC. It is likewise undisputed that appellees knew she had engaged in protected activities. At issue here is whether Blagg presented sufficient evidence upon which a reasonable jury could find that (1) appellees took an adverse employment action against Blagg and (2) appellees took such action because of Blagg's participation in a protected activity, i.e., a causal connection between the protected activity and the adverse employment action.

{¶ 75} Although an "adverse employment action" is a required element of a retaliation claim, this requirement has been interpreted "extremely broadly" such that an adverse action "'need not be employment-related'" to satisfy the requirement. *Pettay v. Adtalem Global Edn., Inc.*, 2022-Ohio-3015, ¶ 10 (10th Dist.), quoting *Greer-Burger* at ¶ 13, fn. 2, citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 67 (2006) (holding that Title VII's antiretaliation

provision "is not limited to discriminatory actions that affect the terms and conditions of employment" and "extends beyond workplace-related or employment-related retaliatory acts and harm"). For an act to constitute an actionable adverse employment action under R.C. 4112.02(I), the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, i.e., that it "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Hughes v. Miller*, 2009-Ohio-963, ¶ 27-28 (8th Dist.), quoting *Burlington*, 548 U.S. at 68; *see also Smith v. Superior Prod., LLC*, 2014-Ohio-1961, ¶ 34 (10th Dist.).

{¶ 76} To establish a causal connection between the protected activity and the adverse employment action, a plaintiff must produce evidence from which a reasonable factfinder could infer that the defendant would not have taken the adverse action had the plaintiff not engaged in the protected activity. *Woods v. Capital Univ.*, 2009-Ohio-5672, ¶ 48 (10th Dist.). A plaintiff may show the requisite causal connection "through direct evidence or through knowledge coupled with a closeness in time that creates [a]n inference of causation." *Meyers v. Goodrich Corp.*, 2011-Ohio-3261, ¶ 28 (8th Dist.); *see also Smith v. Stow*, 2023-Ohio-4302, ¶ 30 (9th Dist.). "Close temporal proximity between the [defendant's] knowledge of the protected activity and the adverse employment action alone may be significant enough to constitute evidence of a causal connection — but only if the adverse employment action occurs 'very close' in time after [a defendant] learns of a protected activity." *Meyers* at ¶ 28, quoting *Clark Cty. School Dist. v. Breeden*, 532

U.S. 268, 273 (2001); *see also Stow* at ¶ 30; *Nance v. Lima Auto Mall, Inc.*, 2020-Ohio-3419, ¶ 57-58 (3d Dist.), citing *Putney v. Contract Bldg. Components*, 2009-Ohio-6718, ¶ 57 (3d Dist.) (noting that it is a "small subset of cases where temporal proximity alone may be sufficient to establish causality").  Where "some time" elapses between the protected activity and the subsequent adverse action, the plaintiff "must produce other evidence of retaliatory conduct, namely, evidence of additional discrimination" that occurred between the time of the protected activity and the adverse action to establish causation.  *Meyers* at ¶ 29; *Stow* at ¶ 31.

{¶ 77} S.T.O.F.F.E. contends that Blagg could not establish the adverse employment action and causation elements of her retaliation claim given the "undisputed" facts that (1) Blagg "quit" her job voluntarily, (2) did not report her complaint to the board until after she walked off the job and (3) refused to speak with Burns about returning to work.

{¶ 78} S.T.O.F.F.E. points out that Blagg has not claimed constructive discharge, i.e., Blagg has not claimed that she was subjected to working conditions so intolerable that she felt compelled to resign and asserts that Blagg "cannot turn her decision" to voluntarily leave the credit union "into a retaliation claim."

{¶ 79} Nestlé similarly contends that Blagg's retaliation claim fails "as a matter of law" because her "own words and conduct" prove that she voluntarily quit her position with S.T.O.F.F.E.  Nestlé further argues that it did not — and could not — take any adverse employment action against Blagg because it did not employ her and that it had no legal duty to investigate Blagg's claim of harassment by her

coworkers. Nestlé asserts that the "mere fact that [S.T.O.F.F.E.] is physically present in Nestlé's plant does not render Nestlé liable for the conduct of [S.T.O.F.F.E.'s] employees."

### a. Involuntary Termination or Voluntary Resignation

{¶ 80} Involuntary termination of employment is unquestionably an adverse employment action. *Anderson v. Bright Horizons Children's Ctrs., LLC*, 2022-Ohio-1031, ¶ 38 (10th Dist.). Voluntary resignation, however, is not. *See, e.g., Cole v. Fifth Third Bancorp*, 2022-Ohio-774, ¶ 15 (5th Dist.) ("Generally, when an employee voluntarily resigns, he cannot claim he suffered an adverse employment action."). When an employee chooses to resign (and, as here, there has been no claim of constructive discharge), the employee cannot claim that he or she suffered an adverse employment action based on his or her "termination." *See, e.g., Sander v. Gray TV Group, Inc.*, 478 Fed.Appx. 256, 263 (6th Cir. 2012) ("If [plaintiff] quit, then he did not suffer an adverse employment action, and thus cannot prove a claim of . . . discrimination."); *Wilson v. Chipotle Mexican Grill, Inc.*, 2013 U.S. Dist. LEXIS 161685, *20 (S.D.Ohio Nov. 13, 2013) ("When an employee voluntarily resigns, she cannot claim that she suffered an adverse employment decision."); *Baechle v. Energizer Battery Mfg.*, 2010 U.S. Dist. LEXIS 56651, *27 (N.D.Ohio June 9, 2010) (same).

{¶ 81} The evidence presented in this case does not raise a genuine issue of fact as to whether Blagg was terminated in retaliation for complaining about her allegedly hostile work environment. The only reasonable conclusion that could be

drawn from the evidence presented was that Blagg voluntarily quit her employment at S.T.O.F.F.E.

{¶ 82} Undisputed evidence shows that on June 15, 2020, Blagg packed up and removed some of her personal belongings from the office, then left the office, without authority, in the middle of the work day.  Blagg did not return work, as scheduled, the following day.  Instead, that morning, Blagg sent an email to Burns, her supervisor and CEO of the board, in which she confirmed her resignation, stating: "I do not imagine you and I will talk again. . . . I hate the way this ended. . . . I will send my badge and key back in a secured envelope."  Although Blagg now claims that she only intended to "quit for the day" and that she was only following unidentified "policies and procedures" applicable "when there is an issue with management" by "automatically leav[ing]" and contacting the board, her email to Burns made no mention of this and, instead, clearly and unequivocally contemplated the "end" of her employment relationship with S.T.O.F.F.E.  Blagg again confirmed her intent to end her employment with the credit union in a text she sent to Satala later that day:  "[Burns] doesn't feel that I've left the credit union. . . . She may not tell you that I quit."  Blagg never returned to work and she did not respond to Burns' repeated requests to discuss Blagg's decision to leave the credit union.  Instead, shortly after she left the credit union, Blagg filed for unemployment benefits.  Blagg's decision to leave the credit union may have been rash and impulsive, but the only reasonable conclusion that could be drawn, based on her

words and actions, was that Blagg voluntarily resigned her position at the credit union.

{¶ 83} The United States Court of Appeals for the Sixth Circuit considered a similar issue in *Sander*, 478 Fed.Appx. 256. In that case, the court held that the fact that the plaintiff had voluntarily resigned from his position "preclude[d] a prima facie case of retaliation because he did not suffer an adverse action." *Id.* at 266. The Sixth Circuit affirmed the district court's finding "as a matter of law" that the plaintiff had voluntarily resigned from his position where he told "three different individuals at work" that he "planned on quitting" and left in the middle of the work day. *Id.* at 261-263. Although the plaintiff's supervisor later admitted that, after speaking with the plaintiff's wife, he knew that the plaintiff "didn't mean to quit," the court held that this did "not change the fact" that the plaintiff's actions "indicated that he had quit" and rejected the plaintiff's later attempts to revoke his resignation. *Id.* at 262-263.

{¶ 84} Because there is no genuine issue of material fact that Blagg voluntarily resigned from her position at the credit union, she cannot show that S.T.O.F.F.E. retaliated against her by terminating her. *Cf. Swann v. Cardiology Assocs. of Cincinnati*, 2006-Ohio-2758, ¶ 13, 27 (1st Dist.) (affirming summary judgment for employer on employment discrimination claim where, in light of her resignation, employee could not demonstrate that employer had taken an adverse employment action against her).

### b. S.T.O.F.F.E.'s Alleged Mishandling of Blagg's Funds

{¶ 85} Blagg also claims that the credit union retaliated against her for filing her initial charge of employment discrimination with the OCRC by mishandling funds she deposited — disregarding her instructions regarding the accounts to which her loan payments should be applied — and by reporting her closed accounts to a credit bureau. In support of her claim, Blagg points to (1) her affidavit in which she avers that "if a [c]redit [u]nion member instructed us to allocate the member's funds in a certain manner, . . . [w]e did not have discretion to allocate a member's funds contrary to the member's instructions, whether or not the member had delinquent loans," (2) copies of emails exchanged between Blagg and Burns in September 2021 regarding loan payments and (3) "Exhibit 63," which Blagg describes as her "credit report." The September 2021 emails relate to the delinquency of "David's loan," i.e., a loan Blagg's husband had taken out to finance the purchase of a truck, and the failure to use money deposited in Blagg's account to pay down that loan as well as other loans taken out by Blagg. Exhibit 63, the purported credit report, which appears to be a series of very tiny screen shots from a cell phone, is undecipherable.

{¶ 86} Even assuming Blagg gave specific instructions to the credit union regarding the application of her deposited funds to loan payments, even assuming the credit union was required to follow those instructions and failed to do so, even assuming the credit union improperly reported Blagg's closed accounts to a credit bureau and even assuming such actions could constitute an adverse employment action for purposes of R.C. 4112.02(I), Blagg has not presented any evidence from

which a reasonable jury could find that these actions were taken in retaliation for Blagg filing her initial charge against S.T.O.F.F.E. with the OCRC.

{¶ 87} Given the amount of time that elapsed between Blagg's filing of her OCRC charge and the alleged mishandling of Blagg's funds, causation could not be reasonably inferred from temporal proximity alone. Blagg filed her initial charge with the OCRC in or around August 2020; the alleged misapplication of loan payments occurred more than a year later.[19] *See, e.g., Meyers*, 2011-Ohio-3261, at ¶ 30 (8th Dist.) ("no inference of causation" could be "deduced from 'temporal proximity'" where employer did not terminate employee until a year after he participated in the internal discrimination investigation); *Hall v. Kosei St. Marys Corp.*, 2023-Ohio-2021, ¶ 20 (3d Dist.) (observing that "[c]ourts have repeatedly held that periods greater than three months are too long to establish causation through temporal proximity"); *Woods*, 2009-Ohio-5672, at ¶ 50 (10th Dist.) (where two months elapsed between employer learning that employee had engaged in a protected activity and the adverse action, the temporal proximity was "not so close" that employee could rely upon timing alone to establish a causal connection); *Aycox v. Columbus Bd. of Edn.*, 2005-Ohio-69, ¶ 21 (10th Dist.) (observing that federal courts have found that intervals of two-to-four months between the protected activity and adverse action are insufficient to show a causal connection). By that time, the OCRC had already dismissed Blagg's initial charge against S.T.O.F.F.E.

---

[19] It is not clear from the record when Blagg's closed accounts were reported to a credit bureau but presumably it occurred thereafter.

Blagg has pointed to no other indicia of retaliatory conduct related to the alleged mishandling of her funds. Because Blagg cannot establish a prima facie case of retaliation against S.T.O.F.F.E., the trial court did not err in granting summary judgment in favor of S.T.O.F.F.E. on Blagg's retaliation claim.

### c. Alleged Retaliation by Nestlé

{¶ 88} With respect to Blagg's retaliation claim against Nestlé, Blagg has presented no evidence that Nestlé failed to investigate her complaint "in violation of its own policy" or that it "influenced" S.T.O.F.F.E.'s decision to cease its investigation and to not bring Blagg back to work at the credit union.

{¶ 89} Blagg contends that because the credit union employees were Nestlé "contractors," they were covered by Nestlé's harassment policy, and Nestlé was, therefore, "obligated to investigate" Blagg's complaint of a hostile work environment and "failed to do so."

{¶ 90} Nestlé's "Policy Against Harassment and Discrimination" applies to "all Nestlé applicants, employees, contractors, visitors, suppliers, vendors, and customers." It prohibits "[h]arassment by customers or vendors toward employees, or by employees toward other employees, customers or vendors." Even assuming S.T.O.F.F.E. and/or Blagg qualified as a "contractor" or "vendor" within the meaning of the policy, the policy (and Nestlé's duty to investigate under the policy) does not, by its terms, extend to claims of harassment made by an employee of a contractor or vendor against other employees of that contractor or vendor. Such claims fall outside the scope of Nestlé's policy.

**{¶ 91}** Kadas testified that he knew Blagg, that he knew Blagg was a credit union employee and that, once he confirmed that Blagg's complaint did not involve any Nestlé employees, he did not further investigate her complaint because there was no further action he could take. He explained that S.T.O.F.F.E. was an independent entity, that Nestlé did not have any authority over the terms and conditions of Blagg's employment with S.T.O.F.F.E. and that any human resources issues for Nestlé's contractors were handled by the employing agencies for the contractors. Blagg has presented no evidence contradicting Kadas' testimony or from which it could otherwise be reasonably inferred that Nestlé owed a duty to Blagg to investigate her claims that she had been subjected to racial harassment by her S.T.O.F.F.E. coworkers at the credit union.

**{¶ 92}** Furthermore, a failure to investigate does not constitute an adverse employment action for purposes of a retaliation claim where, as here, "the alleged failure to investigate is not separate from the alleged uninvestigated complaint but is, in fact, the same discrimination complaint." *Livingston v. Calvillo*, 2020 U.S. Dist. LEXIS 269685, *43 (N.D.Ohio July 15, 2020); *see also Batchelor v. Brilliance School,* 2023 U.S. Dist. LEXIS 206031, *27 (N.D.Ohio Nov. 17, 2023) (because plaintiff's uninvestigated complaint was the same complaint plaintiff claimed defendant refused to investigate as an act of retaliation, plaintiff could not maintain a retaliation claim based on a failure to investigate as a matter of law). As the court explained in *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010):

[A]t least in a run-of-the-mine case, . . . an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint. . . .

An employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint. Her situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint or had the complaint been investigated but denied for good reason or for none at all. Put another way, an employee's knowledge that her employer has declined to investigate her complaint will not ordinarily constitute a threat of further harm, recognizing, of course, that it would hardly provide a positive incentive to lodge such a further challenge.

{¶ 93} A failure to investigate a complaint can constitute an act of retaliation if the failure to investigate is in retaliation for "some separate, protected act by the plaintiff, apart from the uninvestigated complaint itself." *Seoane-Vazquez v. Ohio State Univ.*, 577 Fed.Appx. 418, 433 (6th Cir. 2014); *see also Fincher* at 722 (distinguishing an employer's failure to investigate a complaint of a death threat against an employee that followed a complaint of discrimination by the same employee as sufficient to state a claim of retaliation under Title VII), citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219-1220 (D.C.Cir. 2006). Here, the only retaliatory action Blagg claims was taken by Nestlé was its decision to stop investigating her complaint after it confirmed that no Nestlé employee was involved. No "separate, protected act" by Blagg allegedly occurred here. Thus, any alleged failure to investigate on the part of Nestlé does not constitute a retaliatory adverse employment action.

{¶ 94} Likewise, even assuming such allegations could constitute an adverse employment action, there is no evidence that Nestlé had any role in S.T.O.F.F.E.'s

investigation of Blagg's claims or otherwise "influenced" S.T.O.F.F.E.'s decision not to bring Blagg back to work at the credit union. Based on the record before us, the only board member who communicated with anyone from Nestlé regarding Blagg's complaint was Salata. The record reflects that Salata spoke with Kadas who, after confirming that Blagg's complaint did not involve any Nestlé employees and speaking Nestlé's counsel, (1) informed Salata that there was nothing more for him to do and (2) suggested that Salata contact the credit union's counsel for guidance on how to proceed. Because Blagg cannot establish a prima facie case of retaliation against Nestlé, the trial court did not err in granting summary judgment in favor of Nestlé on Blagg's retaliation claim.

### 3. Aiding and Abetting Claims Against S.T.O.F.F.E. and Nestlé

{¶ 95} Finally, Blagg claims that each appellee "aided and abetted" the other's retaliation against her by failing to continue its own investigation of her claims. Blagg asserts that there are genuine issues of material fact as to whether (1) Nestlé's failure to investigate Blagg's complaint and its alleged "influence" over the credit union's "disposition of [Blagg's] complaints" aided and abetted the credit union's alleged retaliatory termination of Blagg and (2) S.T.O.F.F.E.'s failure to continue its own investigation of Blagg's complaint after Nestlé halted its investigation aided and abetted Nestlé's alleged retaliatory failure to investigate Blagg's complaint. We disagree.

{¶ 96} R.C. 4112.02(J) states:

It shall be an unlawful discriminatory practice . . . [f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.

{¶ 97} "Aid" is generally defined as "to assist" and "abet" as "to incite or encourage." *Evans v. Hillman Group, Inc.*, 2021 U.S. Dist. LEXIS 56373, *12 (S.D.Ohio Mar. 25, 2021); *Luke v. Cleveland*, 2005 U.S. Dist. LEXIS 49630, *19 (N.D.Ohio Aug. 22, 2005), citing *Horstman v. Farris*, 132 Ohio App.3d 514, 527 (2d Dist. 1999). To aid and abet, a person must "'actively participate in, or otherwise facilitate, another's discriminatory act in violation of R.C. 4112.02.'" *Martcheva v. Dayton Bd. of Edn.*, 2021-Ohio-3524, ¶ 74 (2d Dist.), quoting *Johnson-Newberry v. Cuyahoga Cty.*, 2019-Ohio-3655, ¶ 21 (8th Dist.); *see also Luke* at *19 (An aider and abetter is one who "'knowingly does something which he ought not to do . . . which assists or tends in some way to affect the doing of the thing which the law forbids.'"), quoting *State v. Stepp*, 117 Ohio App.3d 561, 568 (4th Dist. 1997).

{¶ 98} Given that we have already determined that appellees were entitled to summary judgment on Blagg's retaliation claims, Blagg's claims of aiding and abetting that retaliation likewise fail as a matter of law. *See, e.g., Martcheva* at ¶ 75-76 ("When a court finds that a defendant is entitled to summary judgment on the underlying discrimination and retaliation claims, 'the court must also necessarily grant summary judgment on the claim of aiding and abetting those claims.'"),

quoting *Weinrauch v. Sherwin-Williams Co.*, 2019 U.S. Dist. LEXIS 114728, *40 (N.D.Ohio July 10, 2019).

{¶ 99} Even if it were otherwise, as stated above, Blagg has presented no evidence that Nestlé in any way "influenced" S.T.O.F.F.E.'s decision to cease its investigation of Blagg's complaint or its failure to bring Blagg back after she complained about her hostile work environment and left the credit union. Likewise, Blagg has presented no evidence that S.T.O.F.F.E.'s failure to further investigate Blagg's complaint in any way influenced Nestlé's decision to discontinue its investigation of Blagg's complaint. The only evidence in the record on this issue is that (1) Kadas told Salata that, after speaking with Blagg (and confirming that Blagg's complaint involved only credit union employees) and Nestlé's counsel, there was no further action for Nestlé to take on Blagg's complaint and (2) Kadas (and Nestlé's counsel) recommended to Salata that she contact the credit union's counsel to discuss the issue, which she did.

## III. Conclusion

{¶ 100} Following a thorough review of the record, viewing the evidence in the light most favorable to Blagg, we conclude that there was no genuine issue of material fact as to any of Blagg's claims against appellees and that appellees were entitled to judgment as a matter of law. Accordingly, the trial court did not err in granting summary judgment on Blagg's claims in favor of appellees. We overrule Blagg's assignment of error.

{¶ 101} Judgment affirmed.

It is ordered that appellees recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
MICHAEL JOHN RYAN, J., CONCUR